Opinion issued June 30, 2005














In The
Court of Appeals
For The
First District of Texas




NO. 01-03-01293-CV




PER-SE TECHNOLOGIES, INC., FORMERLY KNOWN AS
MEDAPHIS CORPORATION, INC., Appellant

V. 

SYBASE, INC., Appellee




On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 1999-38316




MEMORANDUM OPINION
          Appellant, Per-Se Technologies, Inc., formerly known as Medaphis
Corporation, sued appellee, Sybase, Inc., alleging negligent misrepresentation and
fraud. Appellee filed a rule 166a(c) motion for summary judgment, and the trial
court, without specifying its grounds, granted the motion. In five issues on appeal,
appellant contends that appellee did not conclusively negate causation, that appellant
is entitled to recover as damages attorney’s fees incurred in arbitration with a third
party and fees for services to that third party, that appellant is entitled to indemnity
for contractual fees paid, and that the two-year limitations period was tolled by the
discovery rule and by fraudulent concealment. We affirm in part and reverse in part, 
and remand the cause to the court below. 
                    BACKGROUND
          Appellant, Per-Se Technologies, Inc., is the assignee of the rights of BSG
Alliance/IT (BSG). BSG was the party involved in the underlying events in this case. 
          In June 1995, SCI Management Corp. (“SCI”), a nation-wide funeral home
chain, contracted with BSG to develop a company-wide computer system (the
“Horizon Project”) for intra-company communications. The project was divided into
three phases. Phase I consisted of consultation with SCI regarding its requirements
and the design of the system. Phases II and III consisted of the construction and
implementation of the system, with Phase II focusing on SCI’s cemetery business and
Phase III focusing on the funeral home operations. 
          SCI required a system with a “three-tiered architecture” to provide for the
synchronization of data between the individual funeral homes (the third tier), the
regional “clusters” (the middle tier), and the central database located at SCI’s
corporate headquarters (the top tier). This communication process is referred to as
“replication.” Additionally, SCI required that the three-tiered architecture system be
able to replicate data using a “non-persistent connection” (a dial-up connection
present only while data are being sent or received). A non-persistent connection was
a critical component for the system—and therefore the entire Horizon
Project—because a persistent connection, requiring a dedicated data line, would have
been prohibitively expensive, rendering the Horizon Project economically infeasible. 
          To complete its bid for Phase II, BSG solicited bids from Sybase and another
vendor, Oracle, for the design of software needed for the project. In January 1996,
the two vendors conducted a proof of concept (“POC”) to test the capability of their
software designs. Oracle, in its POC, demonstrated that it could replicate the data,
but only in a two-tiered architecture. Sybase’s POC demonstrated that it could
perform the replication in a three-tiered architecture, using its “SQL Anywhere”
database software for the remote locations and its “System 11" database software at
the regional clusters and corporate headquarters. 
          However, while Sybase showed that it could replicate data using a persistent
connection, the system operated in an “error condition” when performing the
replication task using a non-persistent connection. Sybase referred to this as an
“asynchronous” problem. David Cornell, BSG’s lead technical architect on the
Horizon Project, testified that Sybase represented to BSG that a software upgrade to
correct the problem would be available in August 1996. Doug Odom, SCI’s lead
manager, testified that BSG told SCI that BSG had received assurances from Sybase
concerning the software upgrade. 
          Notwithstanding the replication issue discovered during the POC, BSG, in its
report to SCI, recommended that Sybase be selected as the software vendor for the
Horizon Project. Sybase, following its selection, prepared an Engagement Report for
SCI and BSG, detailing the POC. The report stated:
The purpose of this document is to confirm the work conducted
during the course of the engagement, together with details of any
issues, observations, and recommendations arising.

The report further stated that the “POC architecture was found to support the 3 tier
replication scheme satisfactorily.” The report, however, omitted a final page, titled
“Addendum (For Sybase Internal Use Only).” The final page of the report (“Page 6”),
authored by Anish Shah, a Sybase employee, identified eight problems encountered
during the POC, three of which dealt directly with replication issues.


 Page 6 of the
report was not provided to BSG or to SCI. 
          Sybase proceeded with the project and, in the spring of 1996, signed a separate
software licensing agreement with SCI that required Sybase to produce a generally
available version of “Replication Agent for SQL Anywhere” by January 1, 1997 or
when SCI’s remote locations (the third tier of the architecture) required its
development, whichever came later. In the event that Sybase failed in its obligation,
it agreed to procure, at its own expense, the necessary hardware from BSG to allow
SCI to replicate data with a persistent connection. 
          About the same time that Sybase and SCI signed the software licensing
agreement, BSG and SCI negotiated the final terms of the agreement for the second
and third phases of the Horizon Project (“Attachment A-4”). BSG agreed to develop
and build SCI’s Horizon computer system for a fixed fee of $10.3 million dollars, a
substantial amount of which would come from the Phase II portion of the project. 
The agreement also specified that BSG would be responsible for third-party software
vendors that it recommended. 
          On August 28, 1996, Sybase notified BSG that the requisite software to correct
the replication problem would be forthcoming by the end of that calendar year. In
early January 1997, Sybase told BSG that, although the replication software was not
yet ready, it was in its internal alpha test mode and would be available soon. Later
that month, however, Sybase told BSG that not only was the replication software not
yet ready, but they did not have such a product at all. 
          BSG, Sybase, and SCI met on February 12, 1997 to discuss the status of the
Horizon Project. Based on the software licensing agreement Sybase had signed with
SCI, it was determined that Sybase should procure the necessary hardware and
software components to allow replication on the SQL Anywhere database. Sybase,
however, told BSG that this measure was not needed and it would soon have the
replication software ready.



          On March 4, 1997, Sybase delivered to BSG the promised replication software,
called SQL Remote for SQL Server (“SS Remote”). Sybase represented that the
software was beta grade;


 however, when BSG implemented the software, it did not
work. Sybase employee, Jim Graham, testified that he knew the software would not
be ready for SCI to implement their business applications, and that the software
Sybase provided to BSG was pre-beta. 
          SCI, aware of the continuing difficulties with the replication software,
proposed, in May 1997, a new target date of November 1, 1997 for completion of
Phase II of the Horizon Project, and BSG agreed. However, on July 26, 1997, Sybase
reported that it would need an additional 15 weeks to produce adequately functioning
software. In turn, on July 29, BSG informed SCI that it believed that it was
“increasingly unlikely” that the replication within a three-tiered technical architecture
“can be implemented in an acceptable timeframe.” 
          On August 11, SCI informed BSG that it had 30 days in which to fulfill its
contractual obligations. BSG could not cure the deficiencies in its performance—that
is, produce the software—and SCI terminated BSG on September 17, 1997. On June
17, 1998, SCI initiated arbitration proceedings against BSG, alleging that:
BSG represented to SCI that a system designed and built around the
[three-tiered] technical architecture, and utilizing Sybase product, would
function and would meet the Horizon business requirements. SCI,
relying totally upon BSG’s representations and work product, followed
BSG’s recommendation and approved the use of this Sybase software
for Horizon. In fact, BSG did not design a true three-tiered architecture
as it had represented to SCI. Instead, the design was totally dependent
on the Sybase software which was unproven at the time BSG
recommended its use. The result was a system that could not be made
to function.

          BSG attempted to introduce Sybase’s liability as an issue in the arbitration. 
SCI filed a motion for summary judgment, asking for a ruling that BSG was
responsible “for the acts and/or omissions, if any, of Sybase Inc. that contributed to
the failure of the Horizon Project.” The arbitrators granted SCI’s motion for
summary judgment, and the parties settled, with BSG agreeing to refund $5.3 million
of the original $7.4 million SCI had paid to BSG for work on Phase II of the Horizon
Project. BSG then sued Sybase, alleging negligent misrepresentation and common
law fraud, or, alternatively, common law indemnity for its losses.
 

DISCUSSION
I.       Standard of Review
          Summary judgment under rule 166a(c) is proper only when the movant
establishes that there is no genuine issue of material fact and that the movant is
entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); Randall’s Food
Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995); Lawson v. B Four Corp.,
888 S.W.2d 31, 34 (Tex. App.—Houston [1st Dist.] 1994, writ denied). In reviewing
a summary judgment, we must indulge every reasonable inference in favor of the
nonmovant and resolve any doubts in its favor. Johnson, 891 S.W.2d at 644; Lawson,
888 S.W.2d at 33. We will take all evidence favorable to the nonmovant as true. 
Johnson, 891 S.W.2d at 644; Lawson, 888 S.W.2d at 33. As movant, the defendant
is entitled to summary judgment if the evidence disproves as a matter of law at least
one element of each of the plaintiff’s cause of action. Lear Siegler, Inc. v. Perez, 819
S.W.2d 470, 471 (Tex. 1991); Marchal v. Webb, 859 S.W.2d 408, 412 (Tex.
App.—Houston [1st Dist.] 1993, writ denied). When the judgment does not specify
the ground relied on, we will affirm the summary judgment if any of the theories
advanced in the motion for summary judgment and preserved on appeal is
meritorious. See Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 626 (Tex. 1996). 
 

II.      Statute of Limitations
          In its fifth issue, appellant contends that its negligent misrepresentation claim
is not time-barred because the discovery rule applies to the claim and Sybase
fraudulently concealed its wrongdoing. 
          The Texas Supreme Court has identified two categories in which accrual of a
cause of action is deferred for limitations purposes: (1) those involving fraud and
fraudulent concealment and (2) all others. S.V. v. R.V., 933 S.W.2d 1, 4 (Tex. 1996). 
The policy behind the doctrine of fraudulent concealment is that a party cannot avail
itself of the protection of the statute of limitations when its own fraud concealed the
cause of action. Borderlon v. Peck, 661 S.W.2d 907, 909 (Tex. 1983). 
          The second category of cases—all others—allows for deferred accrual because
the nature of the injury is inherently undiscoverable and the evidence of the injury is
objectively verifiable. S.V., 933 S.W.2d at 6–7. The term “discovery rule” has been
applied to both categories; however, the term is conceptually correct only as applied
to the second category of cases because different procedural and substantive rules
apply to these two categories. Id. at 4. 
          A.      Discovery Rule
          Generally, the discovery rule applies in those cases in which the nature of the
injury is inherently undiscoverable and the evidence of the injury is objectively
verifiable. Id. at 6. When a defendant moves for summary judgment on the basis of
limitations and the plaintiff pleads the discovery rule, the defendant must
conclusively prove the date of accrual and negate the discovery rule. Wheeler v.
Methodist Hosp., 95 S.W.3d 628, 637 (Tex. App.—Houston [1st Dist.] 2002, no pet.). 
Thus, it was Sybase’s burden to prove, as a matter of law, (1) that the nature of the
injury was not inherently undiscoverable or that the evidence of the injury was not
objectively verifiable or (2) that there was no genuine issue of material fact about
when BSG discovered or, through the exercise of reasonable diligence, should have
discovered the misrepresentations made by Sybase. Tanglewood Terrace, Ltd. v. City
of Texarkana, 996 S.W.2d 330, 337 (Tex. App.—Texarkana 1999, no pet.). 
          Appellant asserts that Sybase’s misrepresentation that the report discussed “all
of the details of any observations, recommendations or issues arising during the
POC” was undiscoverable until Sybase produced Page 6, which revealed that Sybase
misrepresented the success of the POC. Appellant fails to recognize that it is the
nature of the injury that must be inherently undiscoverable, not the documentation of
the tort. 
          Sybase points to many occasions between January 1996 and September 26,
1997 on which Sybase failed to deliver the promised product or delivered a product
that did not perform as promised. Sybase argues that “[T]here is nothing inherently
undiscoverable about ‘non-functional software.’” Although this argument somewhat
oversimplifies the problem, we agree that BSG’s injury was not inherently
undiscoverable.
          According to appellant’s pleadings, which were attached to Sybase’s motion
as summary judgment proof, Sybase made repeated assurances prior to September 26,
1997 that it would deliver software in a three-tiered architecture that would function
on a non-persistent connection by deadlines that consistently were not kept. Most
notably, on January 29, 1997, approximately one year after the first representations
that Sybase could and would supply the software, a Sybase manager informed BSG
that the desired software did not exist. This information, standing alone, should have
alerted BSG that there was a problem with Sybase’s favorable report on the results
of the POC. Thus, BSG knew, or should have known, more than two years before it
filed suit on July 27, 1999, the nature of its injury. We hold that the discovery rule
did not toll BSG’s two-year statute of limitations. 
          B.      Fraudulent Concealment
          The effect of fraudulent concealment is to delay accrual of the cause of action
until the fraud is discovered or could have been discovered with reasonable diligence.
Velsicol Chem. Corp. v. Winograd, 956 S.W.2d 529, 531 (Tex. 1997). The tolling
effect of fraudulent concealment ends when the plaintiff learns of facts or
circumstances that would cause a reasonable person to be aware of the existence of
a cause of action or would cause a reasonable person to make inquiry that would lead
to the discovery of the cause of action if pursued. Rubalcaba v. Kaestner, 981
S.W.2d 369, 376 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). 
          Appellant cannot rely on fraudulent concealment as a defense to the statute of
limitations for the same reason it cannot rely on the discovery rule. Although Sybase
did not reveal to BSG the existence of Page 6 of its Engagement Report, BSG was put
on notice that there were significant problems with the software Sybase was supposed
to design to complete the project for SCI. We conclude that a reasonable company
would have made inquiry that would have led to the discovery of BSG’s cause of
action. We hold that the accrual of BSG’s cause of action was not tolled by Sybase’s
fraudulent concealment. 
          Accordingly, we overrule appellant’s fifth issue. 
III.    Causation
          In its first issue, appellant contends that Sybase did not conclusively negate the
causation element of appellant’s fraud claims. Appellant argues that the summary
judgment evidence presented by Sybase was disputed and that appellant’s summary
judgment evidence was sufficient to raise a fact issue regarding causation. 
          A defendant’s act or omission causes a plaintiff’s injury only if the act or
omission is a substantial factor in bringing about the injury and without which no
harm would have been incurred. Nixon v. Mr. Property Management Co., 690
S.W.2d 546, 549 (Tex. 1985). A defendant’s conduct will be considered a substantial
factor if it “had such an effect in producing the harm as to lead reasonable [people]
to regard it as a cause, using that word in the popular sense, . . . rather than in the
so-called ‘philosophic sense,’ which includes every one of the great number of events
without which any happening would not have occurred.” Perez, 819 S.W.2d at 472
(quoting the Restatement (Second) of Torts § 431, cmt. a (1965)). Whether the
defendant’s conduct was the cause in fact of the plaintiff’s injuries is ordinarily a fact
question for jury determination. See Farley v. MM Cattle Co., 529 S.W.2d 751, 756
(Tex. 1975); J.K. & Susie L. Wadley Research Inst. and Blood Bank v. Beeson, 835
S.W.2d 689, 698 (Tex. App.—Dallas 1992, writ denied). However, whether a
defendant’s conduct was the cause in fact of the plaintiff’s injury may be decided as
a matter of law if the circumstances are such that reasonable minds could only arrive
at the same conclusion. See Boyd v. Fuel Distribs., Inc., 795 S.W.2d 266, 272 (Tex.
App.—Austin 1990, writ denied). 
          In its motion for summary judgment, Sybase contended that appellant could not
carry its burden to plead and prove that Sybase’s acts were a substantial factor in
bringing about BSG’s injuries. Sybase argued that BSG’s injuries were the result of
its own actions and the actions of third parties. Sybase’s summary judgment evidence
included deposition testimony and documents showing BSG’s problems relating to
management, staffing, and cost overruns. 
          On appeal, Sybase directs us specifically to two pieces of evidence that,
according to Sybase, “conclusively demonstrate that Sybase was not a substantial
factor in the Horizon project’s failure.” The first is a May 30, 1997 BSG letter to SCI
requesting an additional $3 million in fees due to cost overruns on the project. In that
letter, BSG attributed 76 percent of the cost overruns to BSG’s fixed-fee bid to SCI
and other actions and 5 percent of the cost overruns to Sybase. The second is a June
15, 1999 report—nearly a year after BSG had been terminated by SCI—prepared by
Ernst & Young for BSG, which also attributed 5 percent of the responsibility for the
overruns to Sybase’s failure to deliver the software. 
          Based upon these two documents, Sybase argues that, as a matter of law, five
percent is not a substantial factor as required to determine causation. See Nixon, 690
S.W.2d at 549. Sybase cites Kramer v. Lewisville Memorial Hospital and Gross v.
Burt to support this proposition. See Kramer v. Lewisville Mem’l Hosp., 858 S.W.2d
397, 400 (Tex. 1993); Gross v. Burt, 149 S.W.3d 213, 230 (Tex. App.—Fort Worth,
2004, pet. filed). Neither of these cases is on point. Kramer deals with sufficiency
of evidence standards for submitting a medical malpractice case to a jury. 858
S.W.2d at 399–400. Gross determines whether a doctor may be held liable for
medical malpractice when, at the time he took over care of the patient, there was not
a 50 percent or greater chance that any of his acts and omissions was a substantial
factor in the patient’s injuries. 149 S.W.3d at 230. 
          Here, the issue was not the responsibility for overruns, although that may be
a factor to be considered. The issue was whether the alleged fraud of Sybase was a
substantial factor in damages suffered by BSG in connection with the failure of the
Horizon Project. Although Sybase has produced some evidence that there were
causes other than Sybase’s fraudulent actions, it has not conclusively negated its own
actions as a cause. Furthermore, Sybase appears to attempt to shift the burden to
appellant by arguing that appellant did not offer evidence controverting Sybase’s
evidence and that appellant offered irrelevant and incompetent evidence. However,
until Sybase conclusively negated its own actions as a cause of BSG’s injury, BSG
was not required to produce any evidence relating to causation. 
          We sustain appellant’s first issue as it relates to BSG’s cause of action for
fraud. 
 

IV.    Indemnity
          In its fourth issue, appellant contends that the trial court erred in granting
summary judgment on appellant’s alternative theory of indemnity for the $5.3 million
dollars BSG refunded SCI to settle SCI’s arbitration claim. Appellant first argues
that, notwithstanding the merits of this claim, the indemnity issue was not properly
before the trial court because Sybase’s motion for summary judgment addressed only
statutory indemnity. 
          Sybase moved for summary judgment on the basis that appellant could not
establish the elements of its statutory indemnity claim. Specifically, Sybase asserted
that, although appellant did not cite to a specific provision of the Civil Practice and
Remedies Code, the only conceivable chapters that could apply were chapters 32 and
33.


 After Sybase filed its motion for summary judgment, appellant filed its third
amended petition in which it abandoned its claim for contribution and indemnity
under the Texas Civil Practice and Remedies Code and asserted a cause of action for
implied indemnity. Sybase addressed this claim only in its reply papers.
          “[A] motion for summary judgment must itself expressly present the grounds
upon which it is made.” McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337,
341 (Tex. 1993). We have recognized an exception to this rule when the grounds are
broad enough to contemplate all causes of action later pleaded. See Judwin Props.,
Inc. v. Griggs & Harrison, 911 S.W.2d 498, 503 (Tex. App.—Houston [1st Dist.]
1995, no writ) (holding that, when pleading stated no specific cause of action, broadly
stated motion for summary judgment contemplated causes of action eventually
specified in amended pleading). 
          Sybase contends that its motion for summary judgment—in particular the
sentence that “Texas law does not permit Plaintiff’s claim for contribution or
indemnity against Sybase”—was sufficient to contemplate appellant’s common law
indemnity pleading. We disagree. Sybase’s motion specifically addressed only
statutory indemnity under chapters 32 and 33 of the Civil Practice and Remedies
Code. In light of the fact that, in its motion for summary judgment, Sybase addressed
only contribution and indemnity under the Civil Practice and Remedies Code, we
hold that the general statement that “Texas law does not permit Plaintiff’s claim for
contribution or indemnity” cannot be construed to address implied indemnity. See
McConnell, 858 S.W.2d at 341. 
          We sustain appellant’s fourth issue. 
 

V.      Attorney’s Fees
          In its second issue, appellant contends that the attorney’s fees BSG incurred in
the arbitration of the dispute between BSG and SCI are recoverable from Sybase as
damages resulting from Sybase’s fraud. Appellant argues that it is entitled to recover
its attorney’s fees incurred in the arbitration under the “tort of another” exception to
the general rule that attorney’s fees may be recovered only when required by contract
or by statute. 
          The “tort of another” exception is based on principles of equity to compensate
parties who are required to prosecute or defend an action because of the wrongful act
of another. Lesikar v. Rappeport, 33 S.W.3d 282, 306 (Tex. App.—Texarkana 2000,
pet. denied). The party must have incurred the attorney’s fees in a prior action, and
the litigation must have involved a third party. Turner v. Turner, 385 S.W.2d 230,
234 (Tex. 1964). Although some Texas courts of appeals have allowed such
attorney’s fees as damages,


 others have not.


 In Turner, the Texas Supreme Court
referred to a discussion of this exception in an annotation in 45 A.L.R.2d 1184. 
However, the court did not apply the exception in that case and has not directly
addressed this issue. See id. 
          In the present case, SCI filed for arbitration of its claims against BSG based on
representations made by BSG to SCI and BSG’s breach of its contract with SCI. 
Therefore, under the “tort of another” exception, BSG is not entitled to recover
attorney’s fees incurred in the arbitration because it is not a wholly innocent party. 
See Dayton Hudson Corp. v. Eldridge, 742 S.W.2d 482, 488 (Tex. App.—Dallas
1987, writ denied).
          We overrule appellant’s second issue. 
VI.    Change-Order Fees
          In its third issue, appellant contends that it is entitled to recover from Sybase
$1,127,000 in fees BSG expended to perform work added by change orders to its
original agreement with SCI. Appellant argues that the work required by these
change orders was the natural and foreseeable consequences of the fraud committed
by Sybase. Sybase responds that the deposition testimony of former project manager
for BSG, Don Palmour, established that the change orders had nothing to do with the
replication technology. 
          Palmour’s testimony was not clear and unequivocal. His deposition was taken
approximately six years after the events in question. Although he testified that some
of the change orders did not have anything to do with the replication technology, he
often could not remember details of the change orders. For example, during one
exchange, the following occurred: 
Q.The next one is PFS conversion SPPT. Does that mean
something to you? 
 
A.Say that one again.
 
                    Q.      PFS conversion SPPT.
 
                    A.      SPPT is probably support.
 
                    Q.      Okay.
 
                    A.      PFS.
 
                    Q.      This one was $10,120.
 
A.That was a change order, or was that a separate contract
between BSG and SCI?
 
Q.It may have been. Is that your recollection?
 
A.Not that I would be willing to say that I really remembered,
no. No. PFS. That sounds familiar, but I can’t - - I’m
thinking that may be an entity that SCI acquired but I’m
not sure. 
 
Q.I guess you can’t testify whether that has anything to do
with Sybase’s replication technology.

          We conclude that Palmour’s testimony may be some evidence that at least some
of the change orders may have nothing to do with Sybase’s replication technology. 
However, viewing the evidence in the light most favorable to the non-movant, we
cannot say that it established that proposition, as a matter of law, with respect to all
the change orders. 
          Accordingly, we sustain appellant’s third issue. 
CONCLUSION
          We affirm the judgment of the trial court as it relates to the limitations bar of
BSG’s cause of action for negligent misrepresentations. We further affirm the
judgment as it relates to appellant’s claim for attorney’s fees as damages. 
          We reverse the remainder of the judgment and remand the cause for further
proceedings. 
 
 
                                                                        Sam Nuchia
                                                                        Justice

Panel consists of Justices Nuchia, Hanks, and Higley.